**FILED** GY
10/8/2021
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**RECEIVED** JG
6/15/2021
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Andy Hope Williams Jr., *Sui Juris* )<br>*In Propria Persona* )<br>          Plaintiff )<br>    v. )<br>)<br>THE CITY OF AURORA, MAYOR RICHARD )<br>IRVIN AND CITY COUNCIL OF AURORA; )<br>THE ASSOCIATION OF PROFESSIONAL )<br>POLICE OFFICERS; LEE CATAVU; )<br>SERGEANT TATE; )<br>)<br>          Defendants. ) | **1:21-CV-03212**<br><br>JUDGE KNESS<br>MAGISTRATE JUDGE VALDEZ |

**COMPLAINT**

1.    Andy Hope Williams Jr., a Private Attorney General brings this action against the City of Aurora ("City") to ensure the City enacts comprehensive, lasting reforms of the Aurora Police Department. ("APD").

2.    A private attorney general is meant to convey the concept that a private citizen may stand in the shoes of the Attorney General advancing the public interest in a lawsuit on behalf of a significant class of persons.

**INTRODUCTION**

3.    This is an action to redress violations of the Ku Klux Klan Act by the City of Aurora's Police Department, Mayor Richard Irvin and The Association of Professional Police Officers to remedy a pattern or practice of conduct by law enforcement officers that deprives primarily people of color of their rights, privileges, and immunities.

4.    During Reconstruction, Congress enacted the Civil Rights Act of 1871 ("Act"), also known as the Ku Klux Klan Act, which established different remedies for the disorder, intimidation, and violence the Ku Klux Klan instigated against black citizens and their white

1

sympathizers. The Act now codified at 42 U.S.C. § 1985, was passed as part of the Ku Klux Klan Act. When Congress debated the Ku Klux Klan Act in 1871, its House sponsor, Representative, Samuel Shellabarger of Ohio, explained that the legislation's purpose was "the prevention of deprivations which shall attack the equality of rights of American citizens." Cong. Globe, 42d Cong., 1st Sess. 478 (1871).

5.      In describing the amendment that ultimately became section 1985, Rep. Shellabarger explained that "any violation of the right, the animus and effect of which is to strike down the citizen, to the end that he may not enjoy equality of rights as contrasted with his and other citizens' rights, shall be within the scope of the remedies of this section." *Id.*

6.      An important original purpose of Section 1985 was to allow for federal judicial enforcement of the Thirteenth Amendment to curb conspiracies of white citizens who sought to interfere with state authorities' efforts to expand racial justice and equality in the former Confederacy.

7.      Sadly, the City of Aurora has a long history of racial inequality and prejudice in its criminal justice system generally, and within its police force particularly. It is no slight to the dedication of hundreds of thousands of fine police officers nationwide to note that there are far too many tragic cases of lawless police misconduct with far too little accountability. Residents of Aurora have known this brand of suffering more intimately for far too long.

8.      The longstanding policing problems have led to profound mistrust between Aurora residents and the APD. This mistrust reached its most recent flashpoint in May 2020, after the murder of George Floyd.

9.      The only way to restore the badly broken trust between Aurora's residents and the APD is by obtaining injunctive relief and damages in the amount of 10% of the APD budget that

will enable the City to eliminate unconstitutional conduct that has plagued APD for decades.

10.    In seeking injunctive relief and damages, Mr. Williams aims to help provide the City's residents with what they deserve, a police department that respects the resident's constitutional rights, protects their safety, and supports the officers, brave enough to take on these responsibilities, with respect for people regardless of race, skin color, or national origin.

## JURISDICTION AND VENUE

11.    The jurisdiction of the federal court was invoked under the language of Rev. Stat. § 1980, 42 U. S. C. § 1985 (3), 28 U.S.C. §§ 1331 and 1367.

12.    Declaratory and injunctive relief is sought as authorized by Title VI, 28 U.S.C. §§ 2201 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure, and the general legal and equitable powers of this Court.

13.    Venue is proper under 28 U.S.C. § 1391(b) because the City is located in the Northern District of Illinois and the principal events, actions, or omissions giving rise to these claims which occurred in the Northern District of Illinois.

## PARTIES

14.    Andy Hope Williams Jr., has standing to bring this complaint as a "private attorney general" which authorizes a private citizen standing to sue for vindication of a public objective. *Associated Industries v. Ickes*, 134 F.2d 694 (2d Cir. 1943)

15.    Defendant Mayor and City Council of Aurora ("the City") is a municipality and political subdivision of the State of Illinois. At all times material to this Complaint, the employer of Defendant Sergeant Tate, and APD Officers; established policies on and trained, supervised, and disciplined, or failed to do so, its Sergeant and Officers in the use of force, racial profiling,

and violation of people's rights in the City. The City is responsible for funding APD and for the acts or omissions of APD.

16.     Defendant Sergeant Tate is the Sergeant over the Special Operations Group[1] ("SOG"), at all times material to this Complaint, was employed by Defendant City of Aurora in its Division of Police. Sergeant Tate is being sued in his individual and official capacity; used or tolerated the use by other officers of an excessive amount of force; received inadequate training; failed to properly supervise, and/or discipline by or on behalf of Defendant City of Aurora in the use of force during demonstrations and retaliating for speech they opposed and/or resented; and was a "person" under 42 U.S.C. §§ 1983 and 1985 (3) who acted under color of law.

17.     Defendant The Association of Professional Police Officers ("Association"), at all times material to this Complaint, was established in 1977 and is the sole collective bargaining labor union that represents the front-line police officers of the Aurora Illinois Police Department.   The Association advocated, allowed, or tolerated the use by other officers of an excessive amount of force; knew or should have known the officers received inadequate training, supervision, and/or discipline by or on behalf of Defendant City of Aurora in the use of force during demonstrations and retaliating for speech they opposed and/or resented; and was a "person" under 42 U.S.C. §§ 1983 and 1985 (3).

18.     Defendant Lee Catuva, at all times material to this Complaint, is the President of The Association of Professional Police Officers ("Association"), is being sued in his individual and official capacity in that he represents the Association and officers that he knows used or tolerated the use by other officers of an excessive amount of force; knew or should have known received inadequate training, supervision, and/or discipline by or on behalf of Defendant City of

---

[1] SOG investigators patrol neighborhoods known for gun, drug and gang-related crimes and conduct proactive criminal investigations to reduce violent crimes in the city.

Aurora in the use of force during demonstrations and retaliating for speech they opposed and/or resented; and was a 42 U.S.C. §§ 1983 and 1985 (3) who acted under color of law.

19.     The interest in the health and well-being of Aurora residents both physical and economic is implicated in this complaint as it seeks the prevention of present and future harm to Aurora residents including individuals who are, have been, or would be victims of the City's unconstitutional law enforcement practices.

20.     The City's violations affect a substantial segment of the residents of the State of Illinois, including direct victims as well as other members of the public who suffer the indirect effects of the City's unconstitutional law enforcement practices.

21.     It is the declared interest of the State of Illinois that all people in Illinois can maintain personal dignity, realize their full productive capacities, and further their interests, rights and privileges as residents of Illinois. 775 ILCS 5/1-102(E). The City's actions substantially affect or threaten the State of Illinois's public policy and its stated interest in the non-discriminatory treatment of its residents.

22.     Absent the injunctive relief and damages, Aurora residents will continue to be subjected to unconstitutional policing practices.

## HISTORICAL BACKGROUND

### I.     The Origin of Policing Pre-Thirteenth Amendment

23.     The development of policing in the United States closely followed the development of policing in England. In the early colonies policing took two forms. It was both informal and communal, which is referred to as the "Watch," or private-for-profit policing.

24.     The watch system was composed of community volunteers whose primary duty was to warn of impending danger. Boston created a night watch in 1636, New York in 1658 and

Philadelphia in 1700. The night watch was not a particularly effective crime control device because watchmen often slept or drank on duty.

25.     Philadelphia created the first day watch in 1833 and New York instituted a day watch in 1844 as a supplement to its new municipal police force. It was not until the 1830s that the idea of a centralized municipal police department first emerged in the United States. In 1838, the city of Boston established the first American police force, followed by New York City in 1845, Albany, NY and Chicago in 1851. By the 1880s all major U.S. cities had municipal police forces in place.

26.     These "modern police" organizations shared similar characteristics: (1) they were publicly supported and bureaucratic in form; (2) police officers were fulltime employees, not community volunteers or case-by-case fee retainers; (3) departments had permanent and fixed rules and procedures, and employment as police officers, was continuous; (4) police departments were accountable to a central governmental authority.

27.     In the Southern states the development of American policing followed a different path. The genesis of the modern police organization in the South is the "Slave Patrol". The first formal slave patrol was created in the Carolina colonies in 1704. Slave patrols had three primary functions: (1) to chase down, apprehend, and return to their owners, runaway slaves; (2) to provide a form of organized terror to deter slave revolts; and, (3) to maintain a form of discipline for slave-workers who were subject to summary justice, outside of the law, if they violated any plantation rules.

28.     Following the Civil War, these vigilante-style organizations evolved in modern Southern police departments primarily as a means of controlling freed slaves who were now

laborers working in an agricultural caste system, and enforcing "Jim Crow" segregation laws, designed to deny freed slaves equal rights and access to the political system.

29.     White supremacy birthed and nurtured modern-day policing. Indeed, policing today can be traced directly to slavery and the racial regime it relies on and violently sustains.

30.     In both the North and the South, formal policing in America has racist roots. Formal policing in the South developed in the 1700s as slave patrols. The principal tasks of slave patrol policing were to terrorize enslaved Blacks to deter revolts, capture and return enslaved Blacks trying to escape, and discipline those who violated any plantation rules.

31.     In fact, the origins of modern-day policing can be traced back to the "Slave Patrol." The earliest formal slave patrol was created in the Carolinas in the early 1700s with one mission: to establish a system of terror and squash slave uprisings with the capacity to pursue, apprehend, and return runaway slaves to their owners. Tactics included the use of excessive force to control and produce desired slave behavior.



The Evolution of the Police Force

32.     Slave patrols had significant and unfettered power within their communities that derived from Slave Codes. Slave patrols would forcefully enter homes to look for criminal activity-such as harboring enslaved Blacks seeking freedom-or simply because they could.



33.     The Slave Patroller had on oath similar to an oath the police officer makes today:

> "I [patroller's name], do swear, that I will as searcher for guns, swords, and other weapons among the slaves in my district, faithfully, and as privately as I can, discharge the trust reposed in me as the law directs, to the best of my power. So help me, God."



The evolution of excessive force used against People of Color for over 400 years

34.     Policing was created to control free Blacks who were labeled by police as dangerous, felons, or gang members which made them immediate suspects. Slave patrols lay at the roots of the nation's law enforcement excesses, historians say, helping launch centuries of violent and racist behavior toward black Americans, as well as a tradition of protests and uprisings against police brutality similar to the uprising of Nat Turner on the plantation.

35.     The APD routinely employ tactics today that terrorize Black and Latino residents of Aurora for no legitimate reason simply because they can, as it is department policy which they are trained to do so, similar to the slave patrollers.

36.     Slave Patrols continued until the end of the Civil War and the passage of the 13th Amendment. Following the Civil War, during Reconstruction, slave patrols were replaced by militia-style groups who were empowered to control and deny access to equal rights to freed slaves. They relentlessly and systematically enforced Black Codes, strict local and state laws that regulated and restricted access to labor, wages, voting rights, and general freedoms for formerly enslaved people.

37.     Since America's founding, this assumption of dangerousness subjected free Blacks to constant scrutiny and invasion of privacy by white authorities. Laws, such as the Fugitive Slave Act of 1850, federalized Black dangerousness and suspicion in the North, providing slave catchers and police authority to surveil and capture runaway enslaved Blacks and free Blacks.

38.     The myth of racial difference and racialized laws constructed a false narrative of Black and Latino criminality. That is, Black and Latino people pose a direct criminal threat to white people solely because we are a different color, a racist trope that keeps us under perpetual surveillance which is the policy, custom, and practice of the City and APD.

39.     This dangerous narrative has also been used as a justification to over-police majority- minority communities in Aurora-the myth that Black-on-Black crime is out of control. Police have long been the face of oppression to People of Color.[2]

**II.     Post-Thirteenth Amendment Policing and Jim Crow**

40.     After the abolition of slavery in 1865 with the passing of the 13th Amendment toward the end of the Civil War, slave patrols were done away with and modern police departments become more common.

41.     African Americans, however, were still heavily policed by law enforcement officials, especially in areas that passed black codes, or laws that restricted property ownership, employment and other behaviors.

42.     The Ku Klux Klan and other hate groups terrorized black communities, carrying out lynching's and destroying black schools. Some law enforcement and other government officials became KKK members.

43.     For over a century after slavery was formally abolished by the Thirteenth Amendment, police were the masters of ceremonies of Jim Crow. The Black Codes-criminal laws that applied only to Black people and were intended to control the Black body-allowed police to terrorize Blacks to enforce racial subjugation.

44.     Black codes were restrictive laws designed to limit the freedom of African Americans and for all intents and purposes, criminalized every form of African American freedom and mobility, political power, and economic power.

45.     Black Codes that attempted to perpetuate the master/slave relationship as much as possible after emancipation are what were then considered to be "incidents of slavery

---

[2] People of color refer to immigrants, Negros (a/k/a Blacks and Latino's a/k/a Hispanic.

46.     These laws were enforced in racially biased ways, as the police and judicial system targeted Black Americans which is ongoing today.

47.     In 1868, ratification of the 14th Amendment of the U.S. Constitution technically granted equal protections to African Americans essentially abolishing Black Codes, but not their lingering effects.

48.     Jim Crow laws and state and local statutes that legalized racial segregation swiftly took their place. By the 1900s, local municipalities began to establish police departments to enforce local laws in the East and Midwest, including Jim Crow laws. When black Americans protested against segregation and other racist laws, law enforcement officials were often called in like they are today.

49.     Local municipalities leaned on police to enforce and exert excessive brutality on African Americans who violated any Jim Crow law. Jim Crow Laws that still exist today in the City and Aurora Police Department which is a badge and incident of slavery.

**III.     The Ku Klux Klan in Policing**

50.     In the roaring 1920's, the KKK helped rule Illinois.

51.     Attorney Charles G. Palmer, was grand dragon of the Illinois KKK at the time and was quoted saying: "We know we're the balance of power in the state…We can control state elections and get what we want from state government."

52.     In the 1920s, KKK chapters formed around the country and even in historically abolitionist areas like Aurora, Illinois.

53.     The second wave of the Klan that formed after the Civil War became a violent, white supremacist group that tried to control newly freed blacks.

54.     The second-generation Klan was a self-proclaimed morality police, according to the book, *The Ku Klux Klan in American Politics*, by Arnold Rice.

55.     The Southern Poverty Law Center, which tracks hate groups, says four to seven million men and women throughout the country joined the Klan in the 1920s. Among them, were up to 200,000 Illinoisans, and they were political.

56.     During that decade Klan membership grew to between 150,000 and 200,000 white Protestant males in Chicago and its nearby suburbs. The "invisible order" claimed it influenced municipal elections as far away as Aurora.

57.     Members did more than endorse, they became candidates. "Klansmen took it for granted that they should be ever willing, when duty called, to throw their 'hoods into the ring,'" wrote Rice. He quoted an article from the Dawn: "A desire to bring about law enforcement; to wipe out immorality, to improve the public land system, aid in solving the immigration problem these are the things that will compel Klansmen to accept public office…"

58.     In the Aurora area the most common occupations were dentists, police officers, and salesmen.

59.     There have been scandals in over 100 different police departments in 49 different states where individual officers have sent overtly racist emails, texts, or made racist comments via social media. Most recently statements were made by an Officer in Aurora, Illinois in April 2021.

60.     Some of these biases held by police officers are longstanding ones which existed before the individual became an officer. In many instances, the officer attempts to hold these biases secret so departments may not know when an officer may hold racist beliefs.

61.     Some Aurora officers have simply become so immersed in the culture of the Aurora Police Department that they do not even realize that the views being expressed are ones based on white supremacy.

62.     Although the F.B.I. warned of white supremacist infiltrating police department in 2006, the denial of the problem by local police brass has only enabled it to continue seemingly unabated.

63.     This false narrative that we live in a color-blind world and there is no racial bias in police department persists. Because of this storyline that these biases do not exist in departments, few steps are taken to curb these biases or identify officers who carry them.

64.     The residents of Aurora can never achieve fairness and an enhanced quality of life while white supremacists continue to hide within the police department.

65.     The lack of feelings of safety and security for the people of color in Aurora coupled with the constant rise of tensions with police have created a dispiriting relationship between police and the residents of Aurora they are sworn to serve.

66.     White people are overrepresented on the Aurora Police Force which resembles the slave patrols in the 1800's and the KKK in the 1900's.

67.     Without action by a consent decree monitored by the Court, things will only get worse.

68.     In Michelle Alexander's 2010 groundbreaking book, The New Jim Crow, she successfully makes the case that in the United States there has been a connection between racial animus particularly towards blacks and the police especially since civil rights era.

69. People of color have reason to fear the police, law enforcement and public officials should be alarmed at the rise in racial animus in police departments because they are terrorizing our communities like the slave patrols.

70. It should go without saying that most Aurora police officers are not white supremacists or even hold consciously racist views.

71. Most are good people, but as the ones with hate-filled ideologies get more entrenched in police department, there is the risk that they will infect the ones who started the force without those values.

72. Some officers who do not hold these extremist views and disapprove of those views may protect and fail to protect racist officers because of the well-known "blue wall of silence or fear of being blackballed."

73. The racist beliefs of certain Aurora Police Officers have manifested as bias in arrests, the bringing of harsher charges, the fabrication of evidence and even violence in some cases.

74. Aurora Police Officers and the SOG stop blacks and Latinos more than whites and because a disproportionate number of people of color in Aurora are stopped by these police, they are disproportionately exposed to violence with police.

**IV.    Aurora Police Department is a Badge and Incidents of Slavery and Must be abolished**

75. The Aurora Police Department was established in 1857 and is the second largest municipal police department in the State of Illinois.

76. One hundred and seven years later, Aurora hired its first Black Police Officer, Clinton Mayes, while it took one hundred and forty-eight years for Aurora to hire its first Black Police Chief, Bill Powell.

14

77.    The early history of Aurora, Illinois, is tied closely to issues of race and equality[3].

78.    Reality shows that People of Color, mostly Black and Latino are disproportionately stopped by the APD officers, searched by the APD officers, and assaulted by the APD officers including the Special Operations Group ("SOG")

79.    People of color in Aurora are much more likely to be assaulted or excessive force used by police during a routine stop.

80.    The fact that George Floyd's murder inspired mass protests in thousands of cities and towns across America underscores how the epidemic of police violence cannot simply be chalked up to one rogue officer, an isolated incident, or a few bad apples.

81.    Police violence is systemic and can only be stopped by a systemic racial justice intervention. The Thirteenth Amendment is built for this moment-it is a "tool for progressive political mobilization" that must be used to combat racial terror by the police who have been terrorizing residents of Aurora for the last thirty years.

82.    To move toward a future where respect for human rights and a pluralistic society is possible, America must directly grapple with the roots of modern policing in the institution of slavery.

83.    While truth and reconciliation alone are insufficient to achieve restorative justice, they "are valuable practices that can help resolve some aspects of conflict by facilitating healing." A process of truth and reconciliation can-and should-identify and address systemic and institutional failures, rather than merely the acts of individuals. To heal the damage of racist policing, we must acknowledge and address it as one of the badges and incidents of slavery.

---

[3] From Slavery to Glory African Americans Come to Aurora, Illinois 1850-1920, Aurora Historical Society, 2005

84.     Black lives and People of Color have historically never mattered to police.  We have always been the property, the subject, or the enemies of their war. It is time to abolish the institution of policing and replace it with true racial equality and justice.

**A.  Badge and Incident of Slavery**

85.     Defining the badges and incidents of slavery requires an examination of the nexus between group history and the nature and genesis of the complained of injury or condition.

86.     The term "badges of slavery" came to be used primarily as a synonym for slavery's continuing "incidents", as perpetuated by the Black Codes and extended to "widespread [private] violence and discrimination, disparate enforcement of racially neutral laws, and eventually, Jim Crow laws..

87.     In 2010 regarding the Hate Crimes Prevention Act, Congress stated:

> Slavery and involuntary servitude were enforced, both prior to and after the adoption of the 13th amendment to the Constitution of the United States, through widespread public and private violence directed at persons because of their race, color, or ancestry, or perceived race, color, or ancestry. Accordingly, eliminating racially motivated violence is an important means of eliminating, to the extent possible, the badges, incidents, and relics of slavery and involuntary servitude.[4]

88.     Through this finding, Congress invoked as its authority to pass this aspect of the hate crimes bill, Section 2 of the Thirteenth Amendment. While Section 1 of that amendment declares that "[n]either slavery nor involuntary servitude... shall exist within the United States, or any place subject to their jurisdiction," Section 2 gives Congress the "power to enforce" that ban "by appropriate legislation."

---

[4] National Defense Authorization Act for Fiscal Year 2010, Pub. L. No. 111-84, § 4707, 123 Stat. 2190, 2838-39.

89.     Since 1883, the Supreme Court has interpreted Section 2 as "empower[ing] Congress to do much more" than pass direct enforcement legislation. Rather, Section 2 permits Congress "to pass all laws necessary and proper for abolishing all badges and incidents of slavery in the United States"[5]

90.     In *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409 (1968). the Supreme Court construed the Amendment as not only abolishing African slavery, but also empowering Congress to "pass all laws necessary and proper for abolishing all badges and incidents of slavery in the United States.

91.     Similar to the Slave patrols who were known for their high level of brutality and ruthlessness as they maintained control over the slave population, the Aurora Police Department employ similar tactics today.

92.     The members of slave patrols were usually White males and are the same today in the Aurora Police Department.

93.     During early Reconstruction, several groups merged with what was formerly known as slave patrols to maintain control over African American citizens. Groups such as the federal military, the state militia, and the Ku Klux Klan took over the responsibilities of earlier slave patrols and were known to be even more violent than their predecessors.

94.      Over time, these groups began to resemble and operate similar to some of the newly established police departments in the United States and more specifically in Aurora, Illinois.

95.     These slave patrol officers regulated the movements of slaves and free blacks, back then by checking documents, enforcing slave codes, guarding against slave revolts and

---

[5] The Civil Rights Cases, 109 U.S. 3, 20 (1883).

catching runaway slaves. The transition from slave patrols to publicly funded police agencies has seamless and has only evolved as evident by the discriminatory practices and policies used at the APD that primarily focuses on keeping blacks in control by routinely stopping them and asking for their ID's, and where they are going, without any probable cause.

96.     The City of Aurora and Aurora Police Department adopted three distinct characteristics from their English counterparts: (1) limited police authority—the powers of the police are defined by law; (2) local control—local governments bear the responsibility for providing police service; and (3) fragmented law enforcement authority.

97.     A distinct characteristic of policing in the United States during the 1800s is the direct and powerful involvement of politics. During this time, policing was heavily entrenched in local politics. The relationship between the police and local politicians was reciprocal in nature: politicians hired and retained police officers as a means to maintain their political power, and in return for employment.

98.     The relationship was so close between politicians and the police that it was common practice to change the entire personnel of the police department when there were changes to the local political administration.

99.     Mayor Richard Irvin maintains a strong relationship with the Aurora Police Department as he has not made any significant changes and in fact has increased their budget and hired more officers to maintain control over the community.

100.    Yet, for all the horrors people of color, mostly the Negro's and the police, the slave patrols have provided the template for the City of Aurora and the Aurora Police Department.

101.     Policing institutional racism of decades and centuries ago still matters because policing culture has not changed as much as it could. For many People of Color, law enforcement represents a legacy of reinforced inequality in the justice system and resistance to advancement – even under pressure from the civil rights movement and its legacy.

102.     In addition, the APD disproportionately target Black and Latino people as suspects and continue to violate their rights.

## FACTS

103.     Through acts and omissions, the City maintains a policy, custom, or practice of police conduct that violates federal and state law.

104.     This policy, custom, or practice includes a repeated pattern of using excessive force without legal justification, in violation of the Thirteenth Amendment to the U.S. Constitution.

105.     This policy, custom, or practice has a disparate impact on the City's African American and Latino residents in violation of the Illinois Civil Rights Act of 2003 and the Illinois Human Rights Act.

106.     This policy, custom, or practice is further reflected in, and caused by, the City's failure to effectively train, supervise, and support law enforcement officers, and the City's failure to establish reliable programs to detect and deter officer misconduct and administer effective discipline.

107.     Given the nature, extent, and history of the City's unlawful police practices, the City will continue to engage in the unconstitutional and illegal conduct alleged herein, causing irreparable harm to the people of Aurora—as it has for decades—unless directed by this Court pursuant to a judicially enforceable consent decree.

A. **APD officers engage in a repeated pattern of using excessive force. This pattern disproportionately impacts Aurora's African American and Latino residents.**

108. APD officers engage in a repeated pattern of using excessive force when conducting law enforcement activities in a way that disproportionately affects Aurora's African American and Latino residents.

109. Many of these incidents involve the use of deadly force in situations in which no force is objectively reasonable.

110. In each of these situations, the force used by APD officers exceeds the bounds established by federal and state law.

111. APD is the chief law enforcement agency in Aurora and has jurisdiction throughout the City.

112. The City through the APD employs approximately 305 sworn officers.

113. During the course of conduct described in this Complaint, Defendants have received federal financial assistance from the United States Department of Justice, either directly or through another recipient of federal financial assistance.

114. As a condition of receiving federal financial assistance, the City and APD certified that they would comply with all requirements imposed by Title VI and the federal regulations implementing Title VI. The assurances signed by the City bind subsequent recipients, including APD to which the City disburses the funds. The City and APD are responsible for ensuring that APD complies with the requirements of Title VI and its implementing regulations.

115. In the late 1990s, the City adopted zero tolerance policing strategies that prioritized officers making large numbers of stops, searches, and arrests for misdemeanor

offenses without ensuring robust oversight to hold officers accountable for misconduct and protect the constitutional rights of City residents.

116.    APD engages in a pattern or practice of conduct that violates the Constitution and federal laws. These violations include the following:

a. Making unconstitutional stops, searches, and arrests, in violation of the Fourth and Fourteenth Amendments;

b. Using excessive force, in violation of the Fourth Amendment;

c. Retaliating against individuals engaging in constitutionally protected expression, in violation of the First Amendment;

d. Using enforcement strategies that disproportionately impact African Americans and Latino's, in violation of Title VI, the Title VI implementing regulations, 28 C.F.R. §§ 42.101-112, and the Safe Streets Act and its implementing regulations;

e. Failing to make reasonable modifications to their practices regarding the use of force against individuals;

f. Racially profiling people in certain neighborhoods:

g. Obstructing justice by filing false police reports and issuing bogus and improper tickets;

h. Unlawfully strip-searching people without a warrant or probable cause;

117.    The City's and APD's violations of the Constitution and federal law are driven by the City's APD's practices – systemic deficiencies in policies, training, supervision, and accountability structures. Defendants have been aware of these structural challenges for many years but have not taken adequate steps to comply with the Constitution and federal law.

**B.** **The City and the Association of Professional Police Officers is deliberately indifferent to the repeated pattern of APD's use of excessive force and racially discriminatory policing practices.**

118.    External complaints threatened and actual lawsuits, along with the media's frequent coverage of APD's repeated use of excessive force and racially discriminatory police action, have put the City and The Association of Professional Police Officers on notice of APD's unconstitutional conduct.

119.    However, the City and The Association of Professional Police Officers has acted with deliberate indifference to excessive force and discriminatory police action, as evidenced by the inadequate training, supervision, accountability, and officer wellness systems that the City has erected and maintained while the Association of Professional Police Officers advocates and turns a blind eye to this behavior.

120.    As a direct and proximate result of the City's and The Association of Professional Police Officers systemic failure to provide officers with adequate training, supervision, accountability, and mental health support, numerous Aurora residents have been subjected to a repeated pattern of unconstitutional uses of force.

**C.** **The City's and APD's violations of the Constitution and Federal Law Are Rooted in Systemic Deficiencies in Supervision and Accountability**

121.    Defendants' use deficient policies, training, supervision, and accountability systems that contributes to APD's violations of the Constitution and federal law. Defendants have been on notice of these deficiencies for years but have not implemented sufficient reforms to ensure constitutional policing.

122.    Defendants fail to supervise officers effectively or hold them accountable for misconduct, contributing to a pattern of police actions that violate the Constitution and federal law.

123. The City fails to adequately train and supervise its officers. This deficiency manifests itself in multiple ways, including a failure to guide officer activity through effective policies and training; a failure to collect and analyze reliable data to supervise officer enforcement activities; and the lack of a meaningful early intervention system to identify officers who may benefit from additional training or other guidance to ensure that they do not commit constitutional violations.

124. APD's accountability systems are not sufficient to deter misconduct. APD does not consistently classify, investigate, adjudicate, and document complaints of misconduct.

125. In some cases, APD improperly classifies complaints as alleging only minimal misconduct, resulting in minimal investigation and accountability.

126. APD also lacks external oversight to curb its pattern or practice of unconstitutional policing. The City Civilian Review Board ("CRB") has statutory authority to investigate certain types of complaints and make non-binding recommendations to APD. However, the CRB lacks sufficient authority, staff, and funding to provide meaningful oversight and accountability.

127. Together, these failures prevent APD from deterring, identifying, and correcting misconduct that contributes to a pattern or practice of violating the Constitution and federal laws.

**1.     APD's training programs do not adequately prepare new and existing officers for their jobs.**

128. APD's Police Academy, Field Training Officer program, and in-service training programs do not give cadets, recent Academy graduates, or existing officers the necessary tools to lawfully and effectively police Aurora neighborhoods.

129.    APD also does not adequately train individuals once they graduate from the Police Academy and transition to probationary officer status—the last step in training before an ?????

130.    As a result, officers have been the subject of numerous misconduct complaints that are overlooked and are not held accountable.

**2.      The City fails to adequately investigate allegations of officer misconduct and, when appropriate, discipline offending officers.**

131.    APD's system of accountability does not adequately identify and investigate allegations of officer misconduct. As a result, officers are not consistently held accountable for engaging in misconduct or deterred from engaging in future misconduct.

132.    The City also has not adequately investigated instances of alleged police misconduct when sued by victims.

133.    These systemic flaws not only result in a failure to hold APD officers accountable for instances of excessive force and racially discriminatory policing practices, but also signal to officers that they can engage in misconduct with little to no risk that their actions will result in discipline.

**3.      APD does not adequately invest in officer mental health support, thereby contributing to officer fatigue, stress, and decreased morale.**

134.    Officer wellness in APD is not an integral part of the Department's operations," with too few officers being notified about and taking advantage of APD's mental health resources—resources that do not adequately reflect the size of APD's workforce.

135.    For APD officers to be able to do their jobs lawfully, safely, and effectively, a significantly increased investment in officer wellness is critical.

136.    Policing in Aurora is especially stress-inducing, given the increase in shootings,

homicides and community mistrust of APD officers.

> **4.    APD's policies and activities are not sufficiently imbued with community policing principles.**

137.    The City and APD must renew its commitment to community policing and provide the resources necessary to make community policing ingrained in APD's culture.

138.    The President's Task Force on 21st Century Policing recently observed that "[c]ommunity policing must be a way of doing business by an entire police force, not just a specialized unit of that force."

139.    The City has recently announced new initiatives to implement community policing, but these efforts must be sustained and adequately supported. Truly implementing community policing will help provide APD officers and Aurora residents the respect they all deserve.

> **D.    The reforms that the City and APD have announced to date are an important step but do not sufficiently remedy the problem of excessive force and racially discriminatory policing.**

140.    Following the May 31, 2020 rally over the killing of George Floyd and community talks, the City announced certain reforms to APD's officer training, supervision, and accountability systems.

141.    The Mayor announced that as Aurora strives to be a cohesive and thriving place to live, work and visit, it is vital that no person, group or segment of the community feels unheard, unassured and unattached from the process. Collectively, we must work together to ensure justice and equity for all while recognizing the humanity and dignity of all. He then introduced the Community Helping Aurora's Necessary Growth and Empowerment (CHANGE) Reform Initiative.

142.    These announced reforms do not nor have they adequately remedied the APD's repeated pattern of using excessive force and racially discriminatory policing practices against Aurora residents as these patterns and behaviors have not ceased.

143.    A judicially enforceable consent decree and damages is the only viable method for reforming APD to ensure effective, constitutional policing, as well as public and officer safety.

**1.    The City's, The Association of Professional Police Officers and APD's recently announced reforms will not put an end to the repeated pattern of unconstitutional policing in Aurora.**

144.    Community Helping Aurora's Necessary Growth and Empowerment (CHANGE) Reform Initiative

145.    The reforms that the City has announced do not cover many of the areas in need of change. With regard to use of force, for example, officers are not instructed to deescalate situations as soon as possible.

146.    In addition, many of the announced reforms have indicated the City's and APD's policy goals but have not provided a comprehensive roadmap regarding what will be done, when it will be done, and what resources will be used to accomplish the needed changes.

147.    Other announcements have identified specific steps that the City and APD are taking, but the steps are incomplete solutions. To be effective, they require not only consistent attention and buy-in from policymakers and officers over multiple years, but also the implementation of additional policies and funding.

**2.    Lasting, comprehensive reform to policing in Aurora requires a judicially enforceable consent decree and an independent monitor.**

148.    As discussed above, APD's pattern of using excessive force and racially

discriminatory policing practices against Aurora residents' dates back decades and were made aware through several community organizations.

149. The City and APD endeavored to reform police practices and accountability. However, the pattern of unconstitutional policing persisted, leading to the erosion of community trust and confidence in APD.

150. In order to ensure that the City will chart a new course for APD by serving as the catalysts for real, lasting reform and the rebuilding of community confidence in APD, the City needs significant oversight in implementing reforms.

151. To ensure that the City's actions to implement and sustain reforms will be measured and tested, Mr. Williams seeks a consent decree in which this Court would appoint an independent monitor.

152. To further ensure accountability in the reform process, Mr. Williams seeks a consent decree that contains outcome measures that will assess progress on implementation of reforms, as well as whether the implemented reforms have led to reduced patterns of excessive force and discriminatory policing.

153. The decree would cover several substantive reform areas to address the critical deficiencies at APD, including departmental policies and practices, such as the use of force, accountability, training, community policing and engagement, transparency, supervision and promotion.

154. Transparency will also be a key feature of the consent decree that Mr. Williams seeks. For example, this decree would require the independent monitor to submit his or her reports to the Court—not only the parties—and to immediately make these reports available to the general public.

155.    Mr. Williams believes that the decree also should require that status hearings occur regularly. Such hearings would be an effective forum within which to discuss and resolve implementation challenges and disagreements between the parties. The decree would further provide that, in the event the parties could not resolve a material disagreement, the Court would possess jurisdiction to resolve the dispute.

156.    Many of APD's challenges are not new. Prior reform efforts have failed to adequately address these challenges. This Court's intervention is necessary to ensure that the City and APD can finally break with the patterns of the past, restore trust with Aurora's residents, and reduce violence while creating public safety.

**COUNT I**
**Thirteenth Amendment**
**(42 U.S.C. § 1985 (3) All Defendants**
**The Klu Klux Klan Act**

157.    Mr. Williams incorporates by reference the allegations set forth in paragraphs 1–156 above.

158.    Defendants have conspired to deprive Black and Latino residents of Aurora equal protection of the laws.

159.    Section 2 of the Thirteenth Amendment created a statutory cause of action for Negro citizens who have been the victims of conspiratorial, racially discriminatory private action aimed at depriving them of the basic rights that the law secures to all free men.

160.    Section 42 U. S. C. § 1985 (3) states:

> "If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws [and] in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in

furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."

*Id.* § 1985(3).

161.    The Act also "provides a civil penalty against persons who knew of and failed to prevent § 2 violations," which provision is now codified at 42 U.S.C. § 1986.

Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action; and if the death of any party be caused by any such wrongful act and neglect, the legal representatives of the deceased shall have such action therefore, and may recover not exceeding five thousand dollars damages therein, for the benefit of the widow of the deceased, if there be one, and if there be no widow, then for the benefit of the next of kin of the deceased. But no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued.

*Id.* § 1986.

162.    When Defendants assumed the role of Public Office, they took an oath to, in pertinent part, "support the Constitution of the United States and of the state of Illinois, and faithfully perform the duties of their office.

163.    Defendants, by their actions as hereinbefore alleged, have conspired for the purpose of impeding, hindering, obstructing, or defeating the due course of justice, with the intent to injure Black and Latino residents of Aurora from lawfully enjoying their rights to equal

protection of the laws and to not interfere with constitutionally or federally protected rights when motivated by invidiously discriminatory animus.

164.    Defendants, by their actions as hereinbefore alleged, have conspired for the purpose of preventing Black and Latino residents of Aurora to be free from unreasonable searches and seizures, use of excessive force, and the right to equal protection of the laws guaranteed by the fourteenth amendment.

165.    By their conspiracy and acts pursuant thereto, the defendants have willfully and maliciously, directly and indirectly, intimidated and prevented Latinos and other Negro Americans from enjoying and exercising their rights, privileges and immunities as citizens of the United States and the State of Illinois, including but not limited to, their rights to freedom of movement, association and their right to be secure in their person; their right not to be enslaved nor deprived of life, liberty or property other than by due process of law, and their rights to travel the public highways without restraint in the same terms as white citizens in Aurora, Illinois.

166.    Defendants City of Aurora, Mayor Richard Irvin (the overseer), Sergeant Tate and the his SOG officers, violate § 1985(3) because they conspire and have conspired to deny Plaintiffs, on the basis of race and national origin, the equal protection of the laws as detailed above and to deny People of Color their rights under the federal Civil Rights Act, Fourth and Fourteenth Amendment.

167.    Defendants additionally violated § 1985(3) because they conspire and have conspired to prevent People of Color in Aurora, Illinois from exercising their right to movement and travel and to be free from excessive and discrimination by intimidation and threats such as constantly stopping and harassing them based on their class. Such intimidation and threats

amount to deprivation of person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws.

168.    The Defendants and its agents engage in a repeated pattern of using force against persons in Aurora without lawful justification.

169.    This pattern is intentional and willful and exhibits a conscious disregard of or deliberate indifference to the rights of persons in Aurora.

170.    This pattern is undertaken pursuant to a policy, custom, or practice that deprives persons of their rights under the Fourth and Fourteenth Amendment to the U.S. Constitution, in violation of 42 U.S.C. § 1983.

171.    All of the Defendants named in this complaint have and had knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, were about to be committed, and having power to prevent or aid in preventing the commission of the same, neglected and/ or refused to prevent wrongful acts to be committed in violation of 42 U.S.C. § 1986.

**COUNT II**
**Thirteenth Amendment**
**(42 U.S.C. § 1985 (3) City of Aurora**
**Badges and Incident of Slavery**

172.    Mr. Williams incorporates by reference the allegations set forth in paragraphs 1–171 above.

173.    Although on its face, it appears that the 13th Amendment simply abolishes slavery and gives Congress power to enforce that abolition, the Supreme Court has clarified that Congress's enforcement power under Section 2 also extends to eradicating slavery's lingering effects.

174.     Beyond simply nullifying all state laws which establish or uphold slavery, the Supreme Court reasoned that the 13th Amendment has a reflex character also, establishing and decreeing universal civil and political freedom throughout the United States; and it is assumed that the power vested in Congress to enforce the article by appropriate legislation, clothes Congress with power to pass all laws necessary and proper for abolishing all badges and incidents of slavery in the United States.

175.     The 13th Amendment can be seen as treating all forms of racial discrimination as badges and incidents of slavery and its lingering effects.

176.     The purpose of the 13th Amendment was to proclaim, implement and universalize the fundamental principles of freedom. To deprive of the application of the principles is to enslave.

178.     The Aurora Police Department and the Special Operations Group that originated from slave patrols, then became the Klu Klux Clan which has now evolved into the APD that constantly discriminates, terrorizes, unlawfully search, seizes, and uses excessive force primarily against people of color in Aurora and certain neighborhoods, are the badges and incidents of slavery prohibited by the 13th and 14th Amendments.

179.     These burdens imposed upon people of color by the evidently racist officers restrain fundamental rights, which are the essence of civil freedom enshrined in the Constitution of the United States of America.

180.     The institution of the Aurora Police Department, the deprivation of rights imposed by APD and the SOG, must be considered and defined as Badges and Incidents of Slavery.

181.     Badges and incidents of slavery‖ refers to public or widespread private action, aimed at any racial group or population for reasons related to race, that mimics the law of slavery

and has significant potential to lead to the de facto re-enslavement or legal subjugation of the targeted group.

182.    The City of Aurora through the APD deprives the Black and Latino residents of Aurora of their right to freedom of movement, right to be free from bondage, unlawful search and seizure, and the right to enjoy equal protection and equal privilege of the laws.

## Count III
### Civil Rights Act of 1964, 42 U.S.C. § 2000(d) - City of Aurora

183.    Mr. Williams incorporates by reference the allegations set forth in paragraphs 1–182 above.

184.    The law enforcement activities described in this complaint have been funded, in part, with federal funds.

185.    Discrimination based on race in the law enforcement activities and conduct described herein is prohibited under 42 U.S.C. § 2000(d), *et seq.* The acts and conduct complained herein were motivated by racial animus, were intended to discriminate on the basis of race and/or had a disparate impact on people of color, particularly those labeled as black and Latino.

186.    As a direct and proximate result of the above mentioned acts, the class of people represented in this complaint, have suffered injuries and damages and have been deprived of the rights under civil rights laws. Without appropriate injunctive relief and damages, these violations will continue to occur.

## Count IV
### Monell Claim for Declaratory, Injunctive Relief and Damages under 42 U.S.C. § 1983 the City of Aurora

187.    Mr. Williams incorporates by reference the allegations set forth in paragraphs 1–186 above.

188.    The actions of the APD were undertaken pursuant to policies and practices of the Aurora Police Department, described above and below, which were ratified by City Council, the policymakers for the City of Aurora with final policymaking authority.

189.    At all times material to this complaint, Defendant City of Aurora through its Police Department, Police Sergeant, Police Board, Mayor, and City Council had interrelated de facto policies, practices, and customs which included inter alia:

a.    maintaining policies that prevented the class described herein this complaint from exercising their right to freedom of movement and travel without being unlawfully stopped;

b.    maintaining policies that encourage and allow officers to use excessive force;

c.    maintaining a system and policies that target certain neighborhoods to control the residents like they are slaves, while the Mayor and City Council are the masters and the police are the overseers.

190.    The interrelated policies, practices, and customs alleged above were or should have been well-known within the Aurora Police Department especially since they have a Special Operations Group created specifically to help enforce these polices.[6]

191.    The interrelated policies, practices, and customs alleged above were the direct and proximate cause of the unconstitutional acts committed by the Aurora Police Officers and the injuries suffered by the class of people represented in this complaint.

192.    In addition to damages, Mr. Williams seeks injunctive and declaratory relief against the City of Aurora to remedy the city's policies and practices described above that have violated and will continue to violate people of color, particularly those labeled as black and Latino constitutional rights

---

[6] See City of Aurora's website last visited on June 14, 2021 at Special Operations Group | Aurora, IL (aurora-il.org).

## Count V
## Violations of Title VI (City of Aurora)

193.    Mr. Williams incorporates by reference the allegations set forth in paragraphs 1–192 above.

194.    Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

195.    Defendants received and continue to receive federal financial assistance for its programs and activities that are subject to the requirements of Title VI and its implementing regulations.

196.    Defendants have engaged in law enforcement practices, including stops, searches, arrests, and uses of force, that have an adverse disparate impact on African and Latino Americans and that are unnecessary to achieve non-discriminatory objectives.

197.    Securing compliance from the Defendants cannot be achieved without a court order.

198.    Defendants' discriminatory law enforcement practices violate Title VI.

## Count VI
## Violation of the Illinois Human Rights Act (City of Aurora)

199.    Mr. Williams incorporates by reference the allegations set forth in paragraphs 1–192 above.

200.    The City and its agents engage in a pattern or practice of discrimination that denies African Americans and Latinos in Aurora the full and equal enjoyment of the privileges of the City's law enforcement services, in violation of the Illinois Human Rights Act, 775 ILCS 5/5-102(C).

## PRAYER FOR RELIEF

Wherefore, Mr. Williams respectfully prays that:

A.     The Honorable Court, upon filing of this complaint notify the Chief Judge of this Court as required by 28 U.S.C.A., section 2284, so that the Chief Judge may designate two other judges to serve as members of a three-judge court as required by Title 28, U.S.C.A., section 2281 to hear and determine this action.

B.     Declare that the City and its agents have a policy or custom that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, in violation of Section 1983 and Section 1985(3);

C.     Declare that the City and its agents have a policy, custom, or practice that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the State of Illinois, in violation of the Illinois Constitution, the Illinois Human Rights Act, and have violated Title VI;

D.     Declare that the Aurora Police Department and Special Operations Group evolved from Slave Patrols and is a Badge and Incident of Slavery that needs to be abolished;

E.     Enjoin the City and its agents from engaging in any of the predicate acts forming the basis of the policy, custom, practice, or conduct that violations of Title VI described herein;

F.     Order the City and its agents to adopt and implement policies and procedures that identify, correct, and prevent the unlawful conduct described herein that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States;

G.     Order the City and its agents to adopt and implement policies and procedures that identify, correct, and prevent the unlawful conduct described herein that deprives persons

of rights, privileges, or immunities secured or protected by the Constitution or laws of the State of Illinois;

H.      Appoint an independent monitor[7] to oversee the City's adoption and implementation of the required policies and procedures and to report to the Court;

I.      Award Mr. Williams damages pursuant to 42 U.S.C. § 1986;

J.      Order the City and its agents to pay attorney's costs and expenses pursuant to 42 U.S.C. 1988; and

K.      Order such other appropriate relief as the interests of justice may require.

Dated: June 14, 2021

Respectfully submitted,


By: /s/ Andy Hope Williams Jr.
Private Attorney General

Andy Hope Williams Jr.
5707 S. Cass Ave. #681
Westmont, IL 60559
630-479-7330
hope5780@yahoo.com

---

[7] Mr. Williams and his team are able to monitor if the Court will issue an order stating so.

37